## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MOORE HOLDINGS, INC.,
d/b/a SUMMIT CAPITAL

                Plaintiff,

-vs-

SHANGHAI DAIMAY AUTOMOTIVE
INTERIOR CO., LTD., DAIMAY NORTH
AMERICA, INC., and DAIMAY NORTH
AMERICA AUTOMOTIVE, INC.

                Defendants.

Case No. _____

Hon. _____

Removed from Michigan Circuit
Court for the County of Macomb
Case No. 10-2490-CZ
Hon. Diane M. Druzinski

| | |
|---|---|
| FRASCO CAPONIGRO WINEMAN & SCHEIBLE, PLLC<br>Eric D. Scheible (P54174)<br>J. Christian Hauser (P57990)<br>Jonathan D. Ordower (P58015)<br>1668 Telegraph Road, Suite 200<br>Bloomfield Hills, MI  48302<br>(284) 334-6767<br>es@frascap.com<br>ch@frascap.com<br>jdo@frascap.com<br>Attorneys for plaintiff | MILLER CANFIELD PADDOCK AND STONE, PLC<br>Frederick A. Acomb (P44523)<br>Mary Kate Griffith (P72284)<br>150 W. Jefferson, Suite 2500<br>Detroit, MI  48226<br>(313) 963-6420<br>acomb@millercanfield.com<br>griffith@millercanfield.com<br>Attorneys for defendants |

## NOTICE OF REMOVAL

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

    Defendants Shanghai Daimay Automotive Interior Co., Ltd., Daimay North America,

Inc., and Daimay North America Automotive, Inc. remove the case to this court.

1.      On June 11, 2010, plaintiff Moore Holdings, Inc. d/b/a Summit Capital filed this action in the Michigan Circuit Court for the County of Macomb where it was assigned to the Honorable Diane M. Druzinski and given case number 10-2490-CZ.

2.      Defendant Daimay North America, Inc. received via certified mail a copy of the summons and complaint on June 28, 2010.

3.      Defendants Shanghai Daimay Automotive Interior Co., Ltd. and Daimay North America Automotive, Inc. have not yet been served with the summons and complaint but nevertheless consent to join in this notice of removal.

4.      Defendants attach as Exhibit A a copy of all process, pleadings, and orders received from the plaintiff.

5.      Defendants file this notice of removal because the court has subject matter jurisdiction pursuant to The Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the New York Convention") and the diversity of citizenship subject matter jurisdiction statute.

## Jurisdiction Under The New York Convention

6.      Plaintiff seeks commissions pursuant to a sales representative agreement by and between plaintiff and defendant Shanghai Daimay Automotive Interior Co., Ltd. ("Shanghai Daimay").  (Complaint ¶¶ 11-13, 23-25, 33, 44-45.)

7.      Plaintiff attached the sales representative agreement to the complaint and labeled it as Exhibit 1.

8.      Paragraph 16 of the sales representative agreement says that the parties are required to arbitrate their disputes with the Singapore International Arbitration Center:

> 16.    ARBITRATION: Any dispute, controversy or
> difference which may arise between the parties hereto under, out

of or in connection with this Agreement including interpretation or breach hereof shall be settled prima facie through bona fide negotiations between the parties.  If such negotiations should fail to yield any settlement, then such dispute, controversy or difference shall be finally settled by the Singapore International Arbitration Center.  The arbitration proceedings shall be governed by the rules of the Singapore International Arbitration Center.

9.     The Convention for the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") is reproduced at 9 U.S.C. § 201 and implemented in Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201 et seq.

10.     An arbitration agreement arising out of a commercial legal relationship, whether contractual or not, falls under the New York Convention when at least one party to the arbitration agreement is not a U.S. citizen.  9 U.S.C. § 202.

11.     This action falls under the New York Convention.  The sales representative agreement contains an arbitration agreement arising out of a commercial relationship between plaintiff and Shanghai Daimay.  Shanghai Daimay is a citizen of the People's Republic of China.  Shanghai Daimay is a corporation incorporated under the laws of the People's Republic of China.  Shanghai Daimay maintains its principal place of business in the People's Republic of China.

12.     This court has original jurisdiction over this action pursuant to the New York Convention.  The New York Convention mandates that it "shall" be enforced in United States courts.  9 U.S.C. § 201.  It mandates that an action falling under the New York Convention "shall" be deemed to arise under the laws and treaties of the United States.  9 U.S.C. § 203.  It mandates that the district courts of the United States "shall" have original jurisdiction over such an action regardless of the amount in controversy.  *Id.*  It provides that such an action may be

filed in any district court of the United States where the action could have been brought absent the arbitration agreement.  9 U.S.C. §'204.

13.     The case is properly removed to this court under the New York Convention.  The New York Convention provides that when an action pending in state court "relates to" an arbitration agreement falling under the Convention, the defendants may at any time before trial remove the action to the district court of the district and division where the action is pending.  9 U.S.C. § 205.

14.     Plaintiff's claims against Shanghai Daimay are properly removed to this court because the action "relates to" an arbitration agreement falling under the Convention.  9 U.S.C. § 205.  Plaintiff has sued Shanghai Daimay seeking commissions pursuant to a sales representative agreement containing an arbitration agreement falling under the Convention.

15.     The claims against defendants Daimay North America, Inc. and Daimay North America Automotive, Inc. are likewise properly removed to this court because the subject matter of the action against them "relates to" an arbitration agreement falling under the Convention.  9 U.S.C. § 205.  Even if that were not the case the court would have supplemental jurisdiction over the claims against defendants Daimay North America, Inc. and Daimay North America Automotive, Inc. because those claims are so related to the claims against Shanghai Daimay that they form part of the same case and controversy.  29 U.S.C. § 1367.

16.     Indeed, plaintiff seeks to bind defendant Daimay North America, Inc. to the sales representative agreement containing the arbitration clause by making the following allegation: "Daimay created Daimay NA and plaintiff was instructed by Daimay that it would also represented [sic] Daimay NA according to the terms of the Agreement."  (Complaint ¶ 14.)

17.    Plaintiff likewise seeks to bind defendant Daimay North America Automotive, Inc. to the sales representative agreement containing the arbitration clause by making the following allegation: "In 2009, Daimay created Daimay NA Automotive, another alter ego of Daimay (collectively 'Defendants'), another entity that was represented by Summit." (*Id.*)

18.    In addition to these party-specific allegations, plaintiff collectively refers to all three defendants by defining them jointly as "the Defendants" (*id*), and, by use of that definition, then suggests that all three defendants terminated the sales representative agreement (*id.* ¶ 22), terminated the sales representative agreement improperly (*id.* ¶ 26), made representations about the sales representative agreement (*id.* ¶ 28), and are governed by the Michigan Sales Representative Act by virtue of the sales representative agreement (*id.* ¶¶ 42-50).

19.    Plaintiff thus alleges that all three defendants are liable under the sales representative agreement containing the arbitration clause.  (*Id.* ¶¶ 11-13, 23-25, 33, 44-45.)

20.    Accordingly, this case is properly removed to this court under the New York Convention because the claims against all three defendants "relate to" an arbitration agreement falling under the New York Convention.

21.    A court having jurisdiction under the New York Convention may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States.  9 U.S.C. § 206.  Defendants will be filing a motion with this court seeking to compel arbitration.

### Jurisdiction Under The Diversity of Citizenship Subject Matter Jurisdiction Statute

22.    Any civil action brought in a state court of which the district courts of the United States have original jurisdiction may be removed to the district court of the United States for the district and division embracing the place where such action is pending.  28 U.S.C. § 1441(a).

23.     The district courts of the United States have original jurisdiction over all civil actions where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.  28 U.S.C. § 1332(a)(1).

24.     Plaintiff alleges that it is a Michigan corporation with its principal place of business in Ann Arbor, Michigan.  (Complaint ¶ 1.)  Hence plaintiff is a citizen of Michigan.

25.     Shanghai Daimay is a corporation incorporated under the laws of the People's Republic of China with its principal place of business in that country.  Hence Shanghai Daimay is a citizen of China.

26.     Daimay North America, Inc. is a Michigan corporation with its principal place of business in that state.

27.     Daimay North America Automotive, Inc. is a Michigan corporation with its principal place of business in that state.

28.     Hence there would be complete diversity of citizenship (Michigan for plaintiff and China for Shanghai Daimay) but for the fact that plaintiff has also sued Daimay North America, Inc. and Daimay North America Automotive, Inc.

29.     Plaintiff fraudulently joined these two additional defendants.

30.     A plaintiff's fraudulent joinder of non-diverse defendants will not defeat removal on diversity grounds. *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999).  To determine whether a plaintiff has fraudulently joined a defendant, the issue is whether the plaintiff has a reasonable basis for its claims against that defendant. *Graphics Resources Group, Inc. v. Honeybaked Ham Co.*, 51 F. Supp. 2d 822, 825 (E.D. Mich. 1999).

31.     There is no reasonable basis for plaintiff's claim against Daimay North America, Inc.  Only one paragraph of plaintiff's complaint so much as mentions Daimay North America,

Inc.  In that paragraph plaintiff alleges the following: "Daimay created Daimay NA and Plaintiff was instructed by Daimay that it would also represented [sic] Daimay NA according to the terms of the Agreement."  (Complaint ¶ 14.)

32.    That allegation is false.  Shanghai Daimay did not create Daimay North America, Inc. and did not instruct plaintiff that it would also represent Daimay North America, Inc.

33.    There is likewise no reasonable basis for plaintiff's claim against Daimay North America Automotive, Inc.  Only one paragraph mentions Daimay North America Automotive, Inc.  In that paragraph plaintiff alleges the following: "In 2009, Daimay created Daimay NA Automotive, another alter ego of Daimay...another entity that was represented by Summit." (Complaint ¶ 14.)

34.    That allegation is false.  Although plaintiff alleges that Shanghai Daimay created Daimay North America Automotive, Inc. in 2009 (*id*. ¶ 14), plaintiff also alleges – correctly – that the sales representative agreement was terminated three years before then, on May 23, 2006 (*id*. ¶ 22).  Hence Daimay North America Automotive, Inc. was not in existence until three years after plaintiff was terminated.  Thus there is no basis for plaintiff's claim against Daimay North America Automotive, Inc.

35.    Plaintiff's allegation that Daimay North America Automotive, Inc. is an "alter ego" of Shanghai Daimay (*id*. ¶ 14) is demonstrably false.  In *Johnson Controls, Inc. v. J.F. Dunn Enters., Inc.*, 2009 WL 415706, *3 (E.D. Mich. Feb. 19, 2009) the court held that the joinder of a non-diverse party was fraudulent when there was no viable basis for an alter-ego recovery from the non-diverse party.  The plaintiff in *Johnson* failed to offer any basis for concluding that the non-diverse party failed to respect separate corporate existences or abused the formal separation to perpetuate the wrong alleged by the plaintiff.  Plaintiff Summit likewise

fails to offer any basis for the notion that Daimay North America Automotive, Inc. abused the formal separateness between it and Shanghai Daimay or failed to respect its separate corporate existence to perpetuate the wrong alleged by plaintiff. Plaintiff has not shown that there is a viable basis for an alter-ego recovery from Daimay North America Automotive, Inc.

36.     Accordingly there is complete diversity of citizenship because, absent the fraudulently joined defendants, this is an action between plaintiff, a citizen of Michigan, and Shanghai Daimay, a citizen of China.

37.     Plaintiff is seeking the recovery of damages "in an amount in excess of $5,000,000." (Complaint, ¶¶ 41, 50.) Hence the amount in controversy exceeds $75,000.00.

38.     This action is properly removable under 28 U.S.C. §1441(a) and (b) because the United States District Court has original jurisdiction in this case under 28 U.S.C. § 1332(a), which provides: "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between (1) citizens of different States."

39.     Pursuant to 28 U.S.C. §1446, copies of this notice of removal have been served upon counsel for plaintiff and upon the clerk of the circuit court for the County of Macomb.


MILLER, CANFIELD, PADDOCK AND STONE, PLC

By:     s/ Frederick A. Acomb
         Frederick A. Acomb (P44523)
         Mary Kate Griffith (P72284)
         150 W. Jefferson, Ste. 2500
         Detroit, MI 48226
         (313) 963-6420 (voice)
         (313) 496-8454 (facsimile)
         acomb@millercanfield.com
         griffith@millercanfield.com

Dated: July 19, 2010

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I served a copy of this notice of removal via email and via first-class United States Mail, postage prepaid, on July 19, 2010 on:

>      Eric D. Scheible (P54174)
>      J. Christian Hauser (P57990)
>      Jonathan D. Ordower (P58015)
>      FRASCO CAPONIGRO WINEMAN & SCHEIBLE, PLLC
>      Attorneys for plaintiff
>      1668 Telegraph Road, Suite 200
>      Bloomfield Hills, MI   48302
>      (284) 334-6767
>      es@frascap.com
>      ch@frascap.com
>      jdo@frascap.com

I FURTHER CERTIFY that I served a copy of this notice of removal via first-class United States mail, postage prepaid, on this July 19, 2010 on:

>      Clerk
>      Macomb County Circuit Court
>      40 North Main
>      Mount Clemens, Michigan 48043-5656

By:      s/ Frederick A. Acomb

18,135,637.3\144767-00002

9

Approved, SCAO

| Original - Court<br>1st copy - Defendant | | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|

| **STATE OF MICHIGAN**<br>JUDICIAL DISTRICT<br>16th JUDICIAL CIRCUIT<br>COUNTY PROBATE | **SUMMONS AND COMPLAINT** | **CASE NO.**<br>10 ¹⁹-2490-0̶2̶<br>CZ |
|---|---|---|

**Court address**
40 N. Main, Mt. Clemens, MI 48043

Court telephone no.
(586) 469-5243

**Plaintiff's name(s), address(es), and telephone no(s).**
Moore Holdings, Inc., d/b/a Summit Capital

v

**Defendant's name(s), address(es), and telephone no(s).**
Daimay North America, Inc.

**Plaintiff's attorney, bar no., address, and telephone no.**
J. Christian Hauser  (P57990)
Frasco Caponigro Wineman & Scheible, PLLC
1668 Telegraph Rd., Ste. 200
Bloomfield Hills, MI 48302
(248) 334-6767

**SUMMONS   NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR2.111[C])
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued | This summons expires | Court clerk |
|---|---|---|
| | 1 2 6 0 | *Carmella Sabaugh* |

*This summons is invalid unless served on or before its expiration date.
This document must be sealed by the seal of the court.

**COMPLAINT**   *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

**Family Division Cases**
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer  pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**General Civil Cases**
☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer  pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**VENUE**

| Plaintiff(s) residence (include city, township, or village)<br>Macomb County | Defendant(s) residence (include city, township, or village)<br>Macomb County |
|---|---|
| Place where action arose or business conducted<br>Macomb County | |

06/09/2010
Date

Signature of attorney/plaintiff

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01  (3/08)  SUMMONS AND COMPLAINT   MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

| PROOF OF SERVICE | SUMMONS AND COMPLAINT |
|---|---|
| | Case No. |

**TO PROCESS SERVER:** You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

## CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE

| ☐ **OFFICER CERTIFICATE**   OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that: (notarization not required) | Being first duly sworn, I state that I am a legally competent adult who is not a party or an officer of a corporate party, and that: (notarization required) |

☐ I served personally a copy of the summons and complaint,

☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint, together with _____

_____
List all documents served with the Summons and Complaint

_____

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

I declare that the statements above are true to the best of my information, knowledge, and belief.

| Service fee | Miles traveled | Mileage fee | Total fee |
|---|---|---|---|
| $ | | $ | $ |

Signature _____

Name (type or print) _____

Title _____

Subscribed and sworn to before me on _____ , _____ County, Michigan.
                                                    Date

My commission expires: _____ Signature: _____
                                      Date                                        Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

## ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____
                                                                                                                                      Attachments

_____ on _____
                                                                                            Day, date, time

_____ on behalf of _____

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

MOORE HOLDINGS, INC., d/b/a SUMMIT
CAPITAL

              Plaintiff,

v.

SHANGHAI DAIMAY AUTOMOTIVE
INTERIOR CO., LTD., DAIMAY NORTH
AMERICA, INC., and DAIMAY NORTH
AMERICA AUTOMOTIVE, INC.,

              Defendants.

10 - 2 4 9 0 - C Z

Case No. 10-            - CZ

RECEIVED

JUN 1 1 2010

CARMELLA SABAUGH
MACOMB COUNTY CLERK



_____/

Eric D. Scheible (P54174)
J. Christian Hauser (P57990)
Jonathan D. Ordower (P58015)
FRASCO CAPONIGRO
WINEMAN & SCHEIBLE, PLLC
Attorneys for Plaintiff
1668 Telegraph Road, Suite 200
Bloomfield Hills, MI 48302
(248) 334-6767 / (248) 334-0999 fax
es@frascap.com
ch@frascap.com
jdo@frascap.com

_____/

*There is no other pending or resolved civil action
arising out of the same transaction or occurrence
as alleged in the Complaint.*

## COMPLAINT
## AND JURY DEMAND

      Plaintiff Moore Holdings, Inc., d/b/a Summit Capital ("Summit") through its attorneys,

Frasco Caponigro Wineman & Scheible, PLLC, states for its Complaint as follows:

### JURISDICTION AND VENUE

    1.     Summit is a Michigan Corporation with its primary place of business located at

260 Barton Shore Drive, Ann Arbor, Michigan.

2.     Upon information and belief, Shanghai Daimay Automotive Interior Co., Ltd. ("Daimay") is a foreign corporation that conducts business in Macomb County, Michigan.

3.     Upon information and belief, Daimay North America, Inc. ("Daimay NA") is a Michigan corporation that conducts business in Macomb County, Michigan.

4.     Upon information and belief, Daimay North America Automotive, Inc. ("Daimay NA Automotive") is a Michigan corporation that conducts business in Macomb County, Michigan.

5.     The amount in controversy in this matter exceeds the sum of $25,000,, exclusive of interest, costs and attorneys' fees, and is otherwise within the jurisdiction of this Court, pursuant to MCL §§600.601, 600.605.

6.     Because Defendants regularly conduct business in Macomb County, venue is proper in this Court, pursuant to MCL §600.1621.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

7.     Summit represents domestic and foreign automobile manufacturing companies to Original Equipment Manufacturers ("OEMs") and automotive tier suppliers in North America. Summit also assists foreign automobile manufacturing companies in their native countries by establishing a base of operation to perform quality control, component testing, process control, and other activities that enhance customer processes.

8.     Daimay is an automotive parts manufacturer based in China. Daimay builds sun visors, steering wheels, seating components, and other parts used in automobiles ("Components and Products").

9.     In early 2005, Jiang Yintai ("Mr. Yintai"), the Chairman of Daimay, was introduced to Kevin Moore ("Mr. Moore") of Summit.  Prior to meeting Mr. Moore, Daimay had been unsuccessful in obtaining a platform (or program) for its Components and Products to Ford

Motor Company ("Ford"), and Mr. Yintai expressed his interest to Mr. Moore for Summit to help in this endeavor, as well as with other automobile manufacturers including, but not limited to, General Motors ("GM") and Chrysler Group LLC ("Chrysler"). In this regard, Mr. Yintai and Mr. Moore had multiple meetings and conversations concerning Daimay's retention of Summit as its exclusive sales representative to procure Customers (collectively "Ford, GM, and Chrysler") for sales of Components and Products in North America.

10.     Mr. Yintai and Mr. Moore discussed the scope of Summit's representation, the percentage Summit would be paid, the Components and Products that would be marketed, as well as the Customers.

11.     On or about June 1, 2005, after approximately six (6) months of negotiations, Summit and Daimay entered into a Sales Representation Agreement ("Agreement") wherein Summit agreed to represent Daimay **for the business development and solicitation and sale** of Daimay's products to the "OEM" automotive manufacturers in exchange for Daimay's agreement to pay Summit a commission equal to five percent (5%) to ten percent (10%) of Defendants' sales of Components and Products to Customers procured by Summit (**Exhibit 1**).

12.     Summit and Daimay agreed that Summit's initial procurement efforts would be towards Ford, GM, and Chrysler. Daimay retained the authority to approve any additional automobile manufacturers (**Exhibit 1**).

13.     In exchange for the payment of commissions, as described above, Summit agreed to procure the Customers for the sales of Components and Products (excluding sun visors to GM) (**Exhibit 1**).

14.     Both prior to and immediately after the Agreement was executed by the parties, Summit began utilizing its professional contacts in North America and China to procure the Customers on behalf of Daimay. In addition, Daimay created Daimay NA and Summit was

3

instructed by Daimay that it would also represented Daimay NA according to the terms of the Agreement.  In 2009, Daimay created Daimay NA Automotive, another alter ego of Daimay (collectively "Defendants"), another entity that was represented by Summit.

### THE FORD TEAM

15.    Summit designated James Podbeilski ("Mr. Podbeilski") and Ingo Klug ("Mr. Klug") to procure Ford on behalf of Defendants.  Both Mr. Podbeilski and Mr. Klug were, and are, intimately familiar with the specifications, technical requirements, and design requirements implemented at Ford, as well as the various points of contact with whom to solicit quotations and product details at Ford.

16.    Messrs. Podbeilski and Klug immediately began Summit's procurement efforts at Ford including, but not limited to, providing Ford buyers with details about the Components and Products in an effort to develop business and solicit sales of Components and Products in addition to placing Defendants on Ford's approved supplier list.  As a result of Summit's efforts, and at great cost and expense incurred by Summit, Defendants were awarded Ford platforms (or programs) that utilized Components and Products manufactured by Defendants.

17.    To illustrate Summit's successful procurement efforts, Summit was able to persuade Ford to delay the quote for the F150 truck series in order for Defendants to submit their pricing for the platform (or program).

### THE GM AND CHRYSLER TEAM

18.    Summit designated Matt Burkhart ("Burkhart") and Mike Sweeney ("Sweeney") to procure GM and Chrysler on behalf of Defendants.  Burkhart and Sweeney are seasoned sales associates having worked with purchasing and engineers at GM and Chrysler for many years, and were knowledgeable of the specifications, technical requirements, and design requirements

implemented by GM and Chrysler, as well as the various points of contact with whom to solicit quotations and product details.

19.     Burkhart and Sweeney, immediately began Summits' procurement efforts at GM and Chrysler including, but not limited to, providing GM's and Chrysler's buyers with details about the Components and Products in an effort to develop business and solicit sales of Components and Products in addition to placing Defendants on GM's and Chrysler's approved supplier list.

20.     As with the efforts made with Ford, Defendants were subsequently awarded certain contracts with GM and Chrysler, and upon information and belief, Defendants continue to provide Components and Products to GM and Chrysler.

### THE WRONGFUL TERMINATION BY DAIMAY

21.     In addition to the Customers, by May of 2006, Summit was actively representing Defendants to various Tier manufacturers such as Johnson Controls, Inc., Intier and Lear who might be source directed by the OEM's.  Summit's procurement efforts included, but were not limited to, solicitation of contacts, and participation in meetings and presentations to Customers and Tier manufacturers both in North America and China.  Defendants were actively involved in this process and provided quotations and input regarding the Components and Products for platforms (or programs).  On May 18, 2006, Summit sent Daimay an email stating that Defendants had been verbally awarded a substantial amount of Ford business (**Exhibit 2**).

22.     Nevertheless, on May 23, 2006 (one week after Summit notified Defendants of the award by Ford), Defendants sent Summit a letter advising Summit that the Agreement was terminated, and that the same would not be renewed.  Defendants' sole stated reason for terminating the Agreement was that Summit had failed to secure any orders for parts from Ford, GM, or Chrysler (**Exhibit 3**).

23.     Paragraph 14, which pertains to post-termination commissions in the event Daimay terminates the Agreement without cause, provides that Summit is entitled to post-termination commissions for four (4) years on all sales to procured Customers of Components and Products if the Agreement is terminated by Daimay without cause (**Exhibit 1**).

24.     Paragraph 13(C) defines "cause" as: "(i) [Daimay's] reasonable belief that [Summit] has breached any provision of this Agreement; no breach shall be deemed to arise hereunder if cured by [Summit] within fifteen (15) days after notice from [Daimay]; (ii) [Summit] becoming insolvent, voluntary filing or permitting the filing of a Petition in Bankruptcy or making an assignment for the benefit of creditors or seeking similar relief under any bankruptcy laws or related statutes; or (iii) [Summit] taking any act involving illegal or fraudulent action" (**Exhibit 1**).

25.     The remainder of paragraph 13 provides: "This Agreement is in force for a period of **one year** and will continue to be renewed automatically for periods of 3 years.  After the **one year** term, the Agreement may be terminated as follows: (A) If [Summit] has shown no evidence of business development; (B) Agreement may be terminated by either party, with or without cause or reason, by giving at least thirty (*30 sic*) days written notice prior to the effective date of such termination" (**Exhibit 1**).

26.     Defendants' reason for terminating the Agreement, *i.e.*, that Summit had failed to secure any orders for parts from Ford, GM, or Chrysler, does not satisfy the requirements of either paragraph 13(A) or (B), which provides for termination of the Agreement with or without cause or reason. Moreover, Defendants' reason for terminating the Agreement does not satisfy the requirements of any subpart of paragraph 13(C).  Accordingly, Defendants' termination of the Agreement was improper.

27.     Remarkably, in their termination letter, Defendants admit that Summit was actively pursuing business development on behalf of Defendants.  The termination letter, dated May 23, 2006, provides, in part: "**We hereby express our gratitude for your efforts made during the past year to develop market (sic) for both of our and your companies.**" (**Exhibit 3**) (emphasis added).

28.     On May 26, 2006, Defendants issued a second correspondence to Summit, admitting that: "[We] fully understand your intention and [we] know the facts that you have been trying very hard...." (**Exhibit 4**).  On June 6, 2006, Defendants sent a third correspondence to Summit that again included: "Thank you for the efforts that you and your colleagues made in the past year." (**Exhibit 5**).

29.     In reliance on Defendants' representations, Summit developed and otherwise procured business opportunities for Defendants with the Customers as well as other major automotive manufacturers in North America.

30.     From June 2005 through May 2006, Summit invested a great deal of time, effort, and money in developing and otherwise procuring business opportunities for Defendants with the Customers as well as other major automotive manufacturers in North America and China.

31.     To be certain of Defendants' intent to avoid their commission obligation, subsequent to Defendants' wrongful termination of the Agreement, Defendants contacted Matt Burkhart and Mike Sweeney, in an attempt to solicit their relationships with Chrysler, as well as Honda, Toyota, Nissan and Hyundai/Kia for a fraction of the commission rate it agreed to pay Summit.  Knowing that Defendants were obligated to pay Summit commissions for the Customer platforms (or programs) that Summit procured on behalf of Defendants, Mr. Burkhart rejected Defendants' offer.

32.    Summit's procurement efforts on behalf of Defendants prior to its wrongful termination are the proximate cause of every platform (or program) awarded by the Customers as well as any other platform (or program) awarded to Defendants by major automotive manufacturers in North America.

33.    Pursuant to Paragraph 14(B) of the Agreement, because Summit was terminated without cause, Defendants are obligated to pay Summit in full the commissions on all bonafide shipments to the customers for a period of four (4) years. The four (4) year post-termination commissions are in recognition of Summit's efforts in procuring customers and/or orders prior to the termination and is deemed fair and equitable by the parties.

34.    By way of this lawsuit, Summit seeks payment of the commissions due and owing for the sales Defendants received on orders for the Components and Products to customers procured by Summit on behalf of Defendants for the life of the part/program due to Defendants' wrongful termination of the Agreement.

### COUNT I – PROMISSORY ESTOPPEL/ DETRIMENTAL RELIANCE/UNJUST ENRICHMENT

35.    Summit restates and realleges all prior allegations as if fully set forth herein.

36.    Beginning in June, 2005, Summit was Defendants' exclusive sales representative for Defendants to the Customers, as more fully described above.

37.    As an inducement for Summit to develop business opportunities and solicit sales for Defendants, Defendants promised Summit that it would receive a commission equal to five percent (5%) to ten percent (10%) of all Defendants' sales of Components and Products sold to Customers procured by and for four (4) years after any wrongful termination of the Agreement by Defendants.

38.    Summit reasonably relied upon Defendants' promises and actions and, thus, diligently performed all of its obligations as Defendants' sales representative and procured all of

8

Defendants' past, present, and future Components and Products sales to Customers as well as any other platform (or program) awarded to Defendants by major automotive manufacturers in North America.

39.     To Summit's detriment, Defendants have accepted and will continue to accept and retain the benefits (*i.e.*, all of Defendants' Components or Product sales) conferred upon it by Summit's efforts and services without paying Summit the promised, reasonably expected, and/or fair value for those efforts and services (i.e., five percent (5%) to ten percent (10%) of all sales).

40.     Defendants' intentional failure to pay Summit its commissions on all of Defendants' past and present Components and Products sales and their refusal to pay on their future sales is unjust and inequitable.

41.     As a direct and proximate result of the foregoing, Summit has been damaged in an amount in excess of $5,000,000.

WHEREFORE, Summit Capital, LLC, hereby prays for a judgment against Defendants Shanghai Daimay Automotive Interior Co., Ltd., Daimay North America, Inc. and Daimay North America Automotive, Inc. as follows:

(a)     Ordering Defendants to pay to Summit a commission of ten percent (10%) of all Defendants' sales to Customers or one any other platform (or program) awarded to Defendants by major automotive manufacturers in North America through the date of Judgment as well as two times that amount, plus costs, interest and attorney fees; and

(b)     Requiring Defendants to provide Summit with monthly Commission Reports and back-up documentation (i.e., a monthly accounting), and timely pay Summit a commission equal to ten percent (10%) of all Defendants' sales to Customers or on any other platform (or program) awarded to Defendants by major automotive manufacturers in North America from May 23, 2006 through the date of the entry of a Judgment.

## COUNT II – VIOLATION OF COMMISSION
## SALES REPRESENTATIVE ACT

42.    Summit restates and realleges all prior allegations as if fully set forth herein.

43.    Defendants are "Principals" and Summit is a "Sales Representative" as defined in the Michigan Sales Representative Commission Act, MCL §600.2961 ("SRCA").

44.    Pursuant to the Agreement, Summit is owed a commission equal to five percent (5%) to ten percent (10%) of all sales procured to Customers and on any other platform (or program) awarded to Defendants by major automotive manufacturers in North America (**Exhibit 1**).

45.    Pursuant to Section 4 of the Agreement, after Components or Product is shipped and payment is received by Defendants, commissions became due and owing to Summit on or before the thirtieth (30th) day following the issuance of an invoice by Summit to Defendants (**Exhibit 1**).

46.    Presently, there are commissions due and owing in excess of forty-five (45) days, and future commissions will become due and owing per the terms of the Agreement.

47.    Pursuant to Section 4 of the SRCA, a principal who fails to pay commissions to its sales representative when due is liable for both of the following:

        (a)    Actual damages caused by the failure to pay commissions when due.

        (b)    If the principal is found to have intentionally failed to pay the commissions when due, an amount equal to two times the amount of commissions due but not paid as required by this section or $100,000, whichever is less.

48.    Defendants have intentionally failed to pay Summit's commissions when due on a monthly basis on all of Defendants' past and present sales of Components and Products to the Customers procured by Summit on behalf of Defendants, and have refused to pay such commissions in the future.

10

49.     Section 6 of the SRCA provides:

> If a sales representative brings a cause of action pursuant to this section, the court shall award to the prevailing party reasonable attorney fees and court costs.

50.     As a direct and proximate result of Defendants' violations of the SRCA, Summit has to date sustained damages in an amount in excess of $5,000,000.

WHEREFORE, Summit Capital, LLC, hereby prays for a judgment against Defendants Shanghai Daimay Automotive Interior Co., Ltd., Daimay North America, Inc. and Daimay North America Automotive, Inc. as follows:

(a)     Ordering Defendants to pay to Summit a commission of ten percent (10%) of all Defendants' sales to Customers or one any other platform (or program) awarded to Defendants by major automotive manufacturers in North America through the date of Judgment as well as two times that amount, plus costs, interest and attorney fees; and

(b)     Requiring Defendants to provide Summit with monthly Commission Reports and back-up documentation (i.e., a monthly accounting), and timely pay Summit a commission equal to ten percent (10%) of all Defendants' sales to Customers or on any other platform (or program) awarded to Defendants by major automotive manufacturers in North America from May 23, 2006 through the date of the entry of a Judgment.

FRASCO CAPONIGRO
WINEMAN & SCHEIBLE, PLLC

Eric D. Scheible (P54174)
J. Christian Hauser (P57990)
Jonathan D. Ordower (P58015)
Attorneys for Plaintiff
1668 Telegraph Road, Suite 200
Bloomfield Hills, MI 48302
(248) 334-6767 / (248) 334-0999 fax

Dated:  June 9, 2010

## JURY DEMAND

Plaintiff hereby demands a trial by jury in the above-captioned action as to all claims in its Complaint as are triable.

FRASCO CAPONIGRO
WINEMAN & SCHEIBLE, PLLC

Eric D. Scheible (P54174)
J. Christian Hauser (P57990)
Jonathan D. Ordower (P58015)
Attorneys for Plaintiff
1668 Telegraph Road, Suite 200
Bloomfield Hills, MI 48302
(248) 334-6767 / (248) 334-0999 fax

Dated: June 9, 2010

# EXHIBIT 1

## SALES REPRESENTATION AGREEMENT

This Agreement made and entered into as of the **1st** day of **June** 2005 between Summit Capital, LLC, a Michigan limited liability company having its principal office at 24 Frank Lloyd Wright Drive, Box 444, Ann Arbor, MI 48106 ("REPRESENTATIVE"), and Shanghai Daimay Automotive Interior Co; Ltd., a Chinese corporation, whose business address is 1299 LianXi Road, Beical Industry Park, Pudong, Shanghai, 201204 P.R. China ("COMPANY").

## BACKGROUND RECITALS

A.   WHEREAS, COMPANY is in the business of manufacturing, producing, importing, exporting and selling or distributing products.

B.   WHEREAS, COMPANY may from time to time add or delete products from its product line.  The term "Product" as used herein shall unless otherwise indicated on Schedule A, mean all products offered, now or in the future, for sale by COMPANY.

C.   WHEREAS, REPRESENTATIVE is in the business of selling and brokering products. REPRESENTATIVE through established channels of distribution has the know how and wherewithal to sell COMPANY's product in accordance with the terms and conditions hereof.

D.   WHEREAS, REPRESENTATIVE shall represent COMPANY in North America (the "Territory") to much of its customers as REPRESENTATIVE shall determine in REPRESENTATIVE'S sole discretion (the "Customers") and REPRESENTATIVE shall solicit orders and sales of Product to be supplied by COMPANY.

NOW, THEREFORE, in consideration of the mutual undertakings of the parties, REPRESENTATIVE and COMPANY agree as follows:

WITNESSED:

1.   <u>APPOINTMENT AS REPRESENTATIVE:</u> COMPANY hereby appoints REPRESENTATIVE as COMPANY's exclusive agent to solicit orders and sales of the Products from Customers within the Territory as indicated on Schedule A which is incorporated by this reference.  Schedule A may be amended from time to time by the written amendment executed by both parties.  REPRESENTATIVE's agency shall be exclusive unless otherwise indicated on Schedule A and only in the event the agency is non-exclusive, may COMPANY appoint other agents to represent it in connection with the sales, promotion or service of Products in the Territory and COMPANY shall not solicit or accept orders directly or appoint other agents who would compete in way manner with REPRESENTATIVE. Orders for product obtained by REPRESENTATIVE and accepted by COMPANY during the term of this Agreement shall be deemed to be an order solicited and procured by REPRESENTATIVE.   For such orders REPRESENTATIVE shall be deemed the procuring cause as defined by customary trade and usage.

1

2.    AUTHORITY OF REPRESENTATIVE: REPRESENTATIVE shall solicit orders on behalf of COMPANY from the Customers, for shipment to the Customers at prices furnished to REPRESENTATIVE or the Customer by COMPANY from time to time and upon the standard terms and conditions of quotation or sale specified from time to time by COMPANY. The sole authority granted pursuant to this Agreement to REPRESENTATIVE is to solicit orders on behalf of COMPANY. REPRESENTATIVE shall not have, nor shall it hold itself out as having, the power to make contracts in the name of, or binding on COMPANY, or to pledge COMPANY's credit, or to extend credit in its name.

3.    ORDERS: All orders shall be subject to acceptance in writing by COMPANY. Decisions regarding credit and all billings and shipments shall be made only by COMPANY, which reserves the right in its sole discretion to decline to accept any such order for or offer to purchase COMPANY's products solicited by REPRESENTATIVE, and/or to discontinue the sale or cancel the order of any Product or to allocate the supply of Products during period of shortages or where COMPANY is reasonably required to do so, without incurring liability to REPRESENTATIVE for the payment of commissions hereunder. . All orders shall be taken on behalf of COMPANY by REPRESENTATIVE and shall be subject to acceptance by COMPANY at its principal offices. All orders shall be taken on terms, prices and conditions fixed by COMPANY, and further, that all invoicing shall be made directly by COMPANY to the purchaser.

4.    COMPENSATION AND PAYMENT: COMPANY will pay and REPRESENTATIVE shall accept in full satisfaction of any and all rights to compensation from COMPANY of any nature whatsoever, **a commission rate range of range from five percent (5%) to ten percent (10%)** of the dollar amount of sales (based on Ex-works price) to Customers. **It is also understood, that certain competitive pressures exist on a project to project basis. Therefore, commission rate will be determined for each project based on written approval between REPRESENTATIVE and COMPANY.** Such commission shall be paid upon the "net ex-works price" being the net price received by COMPANY for product after deductions, trade and/or transportation cost, relevant duty, tax payment, cash discounts, COD charges, adjustments, refunds, returns, allowances and other like costs. The commission shall be deemed earned only after product is shipped and payment is received by COMPANY. Commissions shall be payable in US Dollars on or before the (30th) **thirtieth day** following the date **REPRESENTATIVE invoice** has been received by COMPANY. COMPANY will furnish to REPRESENTATIVE a statement of billings on a monthly basis **and COMPANY shall immediately inform REPRESENTATIVE of payment received.** REPRESENTATIVE shall have a right to audit COMPANY's records on an annual basis in connection with sales and commissions pursuant to this Agreement. No commission shall be payable or due until COMPANY has received full payment from Customer relating to the order for which the commission is due.

5.    COMPANY'S CONTACT WITH CUSTOMERS: Both parties recognize that a Customer may require specialized marketing or other services which can be provided more adequately or efficiently by COMPANY rather than by REPRESENTATIVE. Accordingly, it is agreed that COMPANY reserves the right to

directly provide to any Customer any specialized marketing, including point of purchase displays, cooperative advertising and promotion opportunities or other services which it in its sole discretion deems appropriate. Direct contact as described here shall not be construed as a failure on the part of REPRESENTATIVE to serve the Customer.

6.    BEST EFFORTS AND NON COMPETE: REPRESENTATIVE shall devote such time and effort as may reasonably be necessary to represent COMPANY in the sale of the Products, including the rendering of those services which in COMPANY's reasonable judgment are necessary to properly service Customers. During the term of this Agreement REPRESENTATIVE will not, within the Territory, sell or offer for sale products or service parts of other manufacturers to the Customers which are competitive with any of the Products or service parts of COMPANY.

7.    EMPLOYEES OF REPRESENTATIVE: REPRESENTATIVE shall not be an employee of COMPANY, and all persons employed by REPRESENTATIVE in connection with the operation of its business shall not be considered employees of COMPANY. Any taxes or contributions levied by any local, state or federal law based upon payroll or other employment by REPRESENTATIVE shall be paid by and shall be the exclusive liability of REPRESENTATIVE.

8.    INDEMNIFICATION: The parties indemnify one another as follows:

A.    REPRESENTATIVE shall indemnify COMPANY and hold it harmless from and against any and all claims, losses, expenses and liabilities arising out of the conduct of REPRESENTATIVE's business during the term of this Agreement, including REPRESENTATIVE and employees and agents of REPRESENTATIVE, occasioned by or in connection    with the acts or omissions of REPRESENTATIVE or its employees or agents, or in connection with the use of any motor    vehicle or other equipment or property in the conduct of REPRESENTATIVE's business.

B.    COMPANY shall indemnify REPRESENTATIVE and hold it harmless from and against all liability, loss, costs,    expenses or damages however caused by reason of any product or any    act    or    omission    of COMPANY, including but not limited to any injury (whether to body, property, personal or business character or reputation) sustained by any person or to any person or to property, and for infringement of any patent rights or other rights of third parties, and for any violation of municipal, state or federal laws or regulations governing the product or their sale, which may result from the sale or distribution of the Product by REPRESENTATIVE hereunder.

9.    EXPENSES: REPRESENTATIVE shall pay all of its own expenses, including the salaries and commission of its employees, and the sole compensation to which it shall be entitled shall be the commission provided by the terms hereof.

10.    SAMPLES: RESPONSE TO INQUIRY:  COMPANY from time to time may provide samples of its products to REPRESENTATIVE. The quality and type of a sample supplied to REPRESENTATIVE shall be determined by COMPANY in its sole discretion.  REPRESENTATIVE shall handle and treat the samples as COMPANY proprietary items to be used solely for the promotion and sale of COMPANY's product to the Customers. COMPANY shall provide customary documentation regarding product(s),

price, terms and projected shipment date in response to REPRESENTATIVE's request, subject always however to COMPANY's right to accept or reject any order.

11.   RELATIONSHIP OF PARTIES: The parties agree that their relationship is strictly limited to that of principal and agent, subject to the limitations of the agent's (REPRESENTATIVE's) authority as contained in this Agreement.   They further acknowledge that there is no intent to create a franchise in the sale of COMPANY's product, no investment of capital is expected of REPRESENTATIVE nor is it granted the right to use COMPANY's trademark or trade name except as COMPANY's agent, and they have no common interest in the sale of COMPANY's product except to the extent that REPRESENTATIVE may earn a commission in accordance with the terms of this Agreement.

12.   TERM OF AGREEMENT AND ENGAGEMENT: This Agreement shall continue in full force and effect until terminated in accordance with paragraph 13 following.

13.   TERMINATION: This Agreement is in force for a period of **one year** and will continue to be renewed automatically for periods of 3 years.   After the **one year** term, the Agreement may be terminated as follows:

A.   **If Representative has shown no evidence of business development.**   _new_

B.   Agreement may be terminated by either party, with or without cause or reason, by giving at least thirty (90) days written notice prior to the effective date of such termination.

C.   COMPANY shall have the right to terminate this Agreement effective immediately by giving written notice to REPRESENTATIVE that termination is made for *cause*.   Such written notice shall set forth that the termination is for *cause*, and shall specify the facts constituting cause. Cause shall be defined as: (i) COMPANY's reasonable belief that REPRESENTATIVE has breached any provision of this Agreement; no breach shall be deemed to arise hereunder if cured by REPRESENTATIVE within fifteen (15) days after notice from COMPANY; (ii) REPRESENTATIVE becoming insolvent, voluntarily filing or permitting the filing of a Petition in Bankruptcy or making an assignment for the benefit of creditors or seeking any similar relief under any bankruptcy laws or related statutes; or (iii) REPRESENTATIVE taking any act involving illegal or fraudulent action.

D.   **Current Chinese tax code on commissions is 5% sales tax and 10% income tax. Summit will be responsible for taxes based on US tax code of treating income taxes as a foreign tax credit or deduction, and sales tax as a expense. Full commission will be paid to Summit, then Summit will provide taxes to Chinese government. If Chinese or US tax code changes, COMPANY and REPRESENTATIVE will negotiate mutually beneficial solution. If no solution can be found between COMPANY and**   _new_

**REPRESENTATIVE, Agreement may be terminated immediately by either party by giving written notice prior to the effective date of such termination.**

14. POST TERMINATION COMMISSIONS:

    A.   Termination For Cause:  If termination is "for cause" in accordance with this Agreement, COMPANY shall be obligated to pay commissions as provided herewith for a period of ninety (90) days beyond the effective date of said termination. Commissions shall be paid on all orders shipped to Customers and/or to customers within the Territory in the ordinary course of business during said ninety (90) day period after the effective termination date and thereafter COMPANY shall have no obligation whatsoever to REPRESENTATIVE for any commissions and rights and duties hereunder shall terminate.

    B.   Termination Without Cause:  In the event that COMPANY shall terminate REPRESENTATIVE "without cause" then COMPANY shall have the obligation to pay in full the commissions on all bonafide shipments to the Customers and/or to customers within the Territory for a period of four (4) years after the effective date of the termination without cause.  Said four (4) year post termination commissions are in recognition of REPRESENTATIVE's efforts in procuring customers and/or orders prior to termination and is deemed fair and equitable by the parties hereto. Any commission paid in accordance with this sub-paragraph shall be in full satisfaction of any and all claims of whatsoever kind or nature of REPRESENTATIVE and shall upon payment be a full and complete discharge of said obligations.

15. EFFECT OF TERMINATION: Upon termination or expiration of this Agreement in any manner and for any cause, the following provisions shall take effect.

    A.   REPRESENTATIVE shall immediately discontinue the use of COMPANY's name and any variation thereof as may have been previously authorized in its business operation. REPRESENTATIVE shall immediately return to COMPANY any and all product samples, business cards, customer information, sales literature, order blanks and other property of COMPANY which may be in REPRESENTATIVE's possession or under its control at the date of termination.

    B.   All rights granted to REPRESENTATIVE under or pursuant to this Agreement shall cease.

16. ARBITRATION: Any dispute, controversy or difference which may arise between the parties hereto under, out of or in connection with this Agreement including interpretation or breach hereof shall be settled prima facie through bona fide negotiations between the parties. **If such negotiations should fail to yield any settlement, then such**

dispute, controversy or difference shall be finally settled by the Singapore International Arbitration Center. The arbitration proceedings shall be governed by the rules of the Singapore International Arbitration Center.

17.   ENTIRE AGREEMENT – SUBSEQUENT AGREEMENTS: The terms and conditions of this Agreement supersede any and all previous agreements between the parties, whether oral or written.  The parties agree that the terms hereof comprise the entire agreement between them as of the date hereof.  Any modification, amendment or subsequent agreement between the parties intended to supersede this Agreement must be in writing and signed by the parties to be effective and binding.

18.   NOTICES: It is agreed that notices and announcements provided for hereunder may be made by first class mail, provided that same are addressed to the party required to be notified at the addresses herein stated, or such other address as may be hereafter established as the principal place of business of the party to be notified. Notices shall be considered to be delivered on the date they are deposited postage prepaid in the United States mail in accordance with the provisions hereof.

19.   ASSIGNMENT: The rights granted to REPRESENTATIVE are personal to REPRESENTATIVE and are granted in reliance upon the same, and, accordingly, this Agreement is not assignable by REPRESENTATIVE.  This Agreement is assignable by COMPANY to any subsidiary or affiliate of  COMPANY or to any successor in interest of COMPANY's business as it relates to the Products.

WITNESSES

COMPANY:

BY: _____

ITS: 07/0 /0

_____

REPRESENTATIVE:

_____

ITS: PRESIDENT _____

07/20/05

## SCHEDULE A
## TO
## SALES REPRESENTATION AGREEMENT

## DATED May 12, 2005


REPRESENTATIVE:              Summit Capital (dba. Summit International)


TERRITORY:                   The following territory(s) are assigned to
                             the REPRESENTATIVE:

                             North American automotive industry.  This would
                             also include product sourced in North America, but
                             shipped to other countries.


CUSTOMERS:                   The following customers are assigned to
                             the REPRESENTATIVE:

                             **-Ford Motor Company**
                             **-DaimlerChrysler**
                             **-General Motors**

                             Customers    are    exclusive    to    the
                             REPRESENTATIVE.   Additional customers can
                             be assigned to this contract based on the approval of
                             Daimay.


PRODUCTS:                    The following products are "Products" pursuant to
                             the Agreement:
                             **-SunVisors,    Knob    Assemblies,    Seating
                             Components**

                             **Special notes:**
                             **Sun Visors to General Motors not covered under
                             this agreement.**


7

# EXHIBIT 2

Web-Based Email :: Print

Print  |  Close Window

**Subject:** [FWD: Ford Sunvisor Business]
**From:** kmoore@summitquality.com
**Date:** Thu, May 18, 2006 6:52 am
**To:** Daimay Wang <daimayus@yahoo.com>

Hello Jay. Hope all is well. I thought this might interest you.
Thanks, Kevin

> ------- Original Message -------
> Subject: Ford Sunvisor Business
> From: kmoore@summitquality.com
> Date: Mon, May 15, 2006 9:52 am
> To: chunlei.ye@daimay.com, Allen Wang <allenwang@daimay.com>
> Cc: lklug@aol.com, jpodbielski@epscoamerica.com, kmooresummit@yahoo.com
>
>
> Hello Chunlei and Allen.
>
> We have very good news from Ford. Summit has been able to position
> Daimay in the following position relative to future Ford Sunvisor
> programs:
>
> 1. Daimay is now an official supplier to Ford and will be sourced
> business that will total to be approx 1/3 of Ford's total visor business
> (in time).
>
> 2. The vehicle lines that Daimay will supply have been established by
> Ford. The business is estimated to be about $18 million in sales and
> involving at least 4 different vehicle platforms (vehicle lines with
> minor derivatives). As Ford's comfort level grows with Daimay, future
> volume/revenue levels will also increase.
>
> 3. Daimay is one of only three suppliers chosen in this new long-term
> Ford sourcing strategy. Lear is being let go as a visor supplier to make
> room for Daimay. The other two sources are JCI and Intier.
>
> 4. The vehicle lines awarded to Daimay may or may not include the
> Econoline but that is not to be considered important by Ford because
> Daimay is being sourced vehicle visors now.
>
> 5. This new business will be awarded but not quoted against the other
> two suppliers. Daimay will be given the business automatically. That
> decision has been made. The price will be determined using the previous
> Econoline quote as a cost comparator/model to establish these new prices.
>
>
> 6. Small changes, evolutions, refinements and improvements can be
> incorporated in the cost model, but Ford will expect it will be the
> framework for all future business with respect to cost and be consistent
> with past quotes.
>
> My plan is to be in China at the end of May/Beginning of June to explain
> this in greater detail with you. In addtion to developing the Ford visor
> strategy, we should also begin to focus on what additional product lines
> Daimay would like to develop at Ford.
>
> Thank you for all your support! We are all very excited about this

4/14/2009 10:30

Web-Based Email :: Print

> opportunity.
>
> Kevin Moore

Copyright © 2003-2009. All rights reserved.

4/14/2009 10:30

# EXHIBIT 3

 **Shanghai Daimay Automotive Interior co., Ltd.**

## 上海岱美汽车内饰件有限公司

| | |
|---|---|
| 中国上海浦东新区北蔡镇<br>莲溪路１２９９＃ | 1299, Lianxi Road, Beicai Industry Park, Pudong , Shanghai, China |
| E-mail:sales@daimay.com | http://www.daimay.com |
| DATE 日期： 5/23/06 | PAGE (s) 页数: 1of 1 |
| FROM(发件人)：Shanghai Daimay | TO(收件人)： Summit International |
| TEL(电话)： 86 21 5891 7962 | TEL(电话)： 1 586 201 8387 |
| FAX(传真)： 86 21 5091 3435 | FAX(传真)： 1 734 662 6680 |
| SUBJECT(主题) Termination Letter | |

☐ 紧急        ☐ 请审阅        ☐ 请批注        ☐ 请答复        ☐ 请传阅

Summit International
455E. Eisenhower Park
Suit 300, Ann Arbor, MI 48108
Mr. Kevin Moore

Please be noted the Sales Representation Agreement signed between our and your companies will expire by the date of May 31, 2006. Since we have not received any orders from customers in accordance with the agreement; therefore, we now formally inform your company that the said agreement be terminated, and that it be not renewed. We hereby express our gratitude for your efforts made during the past year to develop market for both of our and your companies.

Thanks,

2006.5.23

Jiang Yintai
Chairman and president
Shanghai Daimay Automotive Interior Co., Ltd.

# EXHIBIT 4

May 26, 2006

Dear Mr. Moore,

Thank you for your email dated 5/25/06. I fully understand your intention and I know the facts that you have been trying very hard, but the reality is that there has be little outcome, which we both have to face and respect. I believe the best we can do now is to put an end to the contract. Another reason caused me up to the decision is that we realize that our sun visors landed pricing in the USA has no significant pricing advantage to that of American oriented suppliers like JCI and Intier. My estimate the difference is less than 10%. With some of this limited margin to be built into your cost and commission, both Daimay and Summit shall not be able to compete in the market place, and eventually we both will be busy for nothing. Given that, we had better stop now to save our valuable time.

As to your coming to Daimay June 2, I shall not be able to meet with you before June 13, I will be frequently on business trips during then. You can raise your suggestions in regard to profitable and concrete programs and we can exchange views via emails. We can set up a face to face meeting later when we both come up with some concrete project and agreement.

Thank you again for your support.

Sincerely,
Jiang Yintai

# EXHIBIT 5

June 6, 2006

Mr. Moore,

Thank you for your email. We think we will have to temporarily terminate our cooperation relationship, because our company is not as big yet and is just beginning to get into North American market. We will need a period of time for adaptation and learning. Therefore our company is now not in the position to largely involve in the North American market, which will cause heavy pressure to product development and will require huge amount of capital flow.

Thank you for the efforts that you and your colleagues made in the past year.


Jiang Yintai